# Exhibit 2

*June 2015*

*1/1/15*

*Signed retroactively: on June/15*

## COMMISSION AGREEMENT

*(fixed after both June at 59:59)*

THIS AGREEMENT dated effective as of the 1st day of January, 2015, by and between

Strangemen & Co. ("Producer") and James Ortiz ("Ortiz"), Edward W. Hardy ("Hardy"), and Jen Loring ("Loring") ("Ortiz", "Hardy" and "Loring" collectively referred to herein as the "Playwright").

1.  (A) The Producer hereby engages the Playwright to create an original stage play, presently entitled "The Woodsman" (the "Play").

    (B) In consideration of the mutual covenants and agreements set forth herein, the Playwright hereby grants to the Producer the right to purchase an exclusive option to present the Play on the live stage, in a world premiere engagement upon the terms and conditions contained incorporated herein. Provided the Producer is not otherwise in default in his obligations under this Agreement and will have made all payments as set forth herein, said exclusive right shall continue for the duration of the term set forth herein below

2.  (A) The Play will be based on an underlying book series, written by L. Frank Baum entitled The Oz Series, which is within the public domain thereby allowing for adaptation for the living stage.

    (B) It is hereby agreed and stipulated that the Playwright delivered a completed script for presentation in a limited run at 59E59 Theatres in New York, New York from January 13 through February 22, 2015. Notwithstanding, Producer still has not received a full copy of the score to the music utilized in the Play, which is required to be delivered to Producer within ten (10) business days of the execution of this Agreement.

3.  In full consideration of the covenants herein, the Producer has paid to the Playwright the following sums (the "Commission Fee") for this limited run at 59E59 Theatres.
    a. Three Hundred ($300.00) Dollars to Ortiz
    b. Two Hundred and Fifty ($250.00) Dollars to Hardy
    c. Fifty ($50.00) Dollars to Loring

4.  The sums as set forth in Paragraph 4 above are intended as payment for work performed by the Playwright in creating the original script and score. They are not intended as, nor should they be construed, as advances against the royalties. Therefore, they are not recoupable against advances, royalties, or other payments due under said option or production agreement. All sums paid hereunder are considered earned by the Playwright when he/she creates the Play and are therefore nonrefundable. In the event the Producer deems the Play unsuitable or unacceptable to his needs and expectations, the Producer will have no recourse against the Playwright for sums paid, except to abandon the project

5.  (A) As the Producer has continued to evaluate the commercial viability of the Play, Producer believes that revisions or modifications in the script may be necessary. The Producer will give the Playwright detailed notes and guidance as to its requirements for same. Upon said notice, the Playwright will have a reasonable period of time in which to write the second draft and deliver same to the Producer—such time to be negotiated in good faith between the Producer and the Playwright. Upon delivery of the second draft, the Producer will have the right in its sole

discretion and expense, to arrange table and/or staged readings of the second draft. If, in Producer's sole discretion, Producer desires to have additional material added to or cut from the Playwright's draft of the Play, he may do so upon written notice to Playwright.

(B) Although the Producer may offer guidance, suggestions, and requests for changes, additions, deletions, or modifications to any part of, or all of, the Play, the Playwright will not be obligated to make or incorporate such alterations. In the event the Playwright refuses to make any requested changes, the Producer may deem the material unacceptable and refuse to exercise his right to option the Play.

6.  Producer intends to move forward with an additional production of the Play pursuant to the rights granted herein. This commercial production, which is intended to play "Off-Broadway," will be the subject of a separate option and production agreement to be negotiated between the parties in good faith.

7.  This Commission Agreement entitles the Producer to the exclusive right to present the Play in its world premiere. However, upon eighteen months' notice, the Producer may exercise the right to present additional productions, on an exclusive basis, for a period of 10 years, from the close of the most recent production of the Play under Producer's license or control. For each additional production, the parties agree in good faith to negotiate terms and conditions of a production agreement

8.  8. (A) Copyright to the Play will belong solely to the Playwright, and the Producer will not, by virtue of this agreement, be entitled to or claim any interest or right therein. This Agreement does not create, bestow, or otherwise give the Producer any claim, right, or interest in any subsidiary rights to the Play, all of which are strictly reserved by the Playwright. While it is expressly understood that all rights to material created by the Playwright in connection to the Play shall be the Playwright's property, it is also understood that the Playwright will grant no rights of any kind in such material to any third party until the expiration of Producer's rights under this Agreement or as set forth in an option or production agreement (if executed).

(B) All other rights not specifically and expressly granted herein to the Producer are reserved by the Playwright.

9.  The Producer acknowledges, first, that the Playwright is the exclusive author of the Play. Second, in the normal course of this agreement and any subsequent productions of the Play by the Producer, Producer may offer suggestions, ideas, dialogue, and other material, which the Playwright may incorporate into the script for use in the contemplated production, subsequent productions, and in publication of the script. All such material that the Playwright chooses to retain in the script will become the exclusive property of the Playwright to use as he/she sees fit. In such event, the Producer, his employees and persons under his control, will have no rights or claims thereto. The Producer will indemnify and hold the Playwright harmless against any claims, encumbrances, judgments, costs, or attorney fees incurred in violation of this paragraph.

10.  Provided that the Producer has made all of his payments hereunder and provided that the Producer is not otherwise in default hereunder, the Playwright will use best efforts to secure

billing credit for the Producer in all subsequent productions and publications of the Play. The Producer's billing credit will appear in substantially the following form:

"Commissioned and Originally Produced by Strangemen & Co."

11. The Playwright represents and warrants that he/she is the sole owner and creator of the Play and that all contributions to the Play by each party collectively referred to as Playwright are wholly original. Except as noted below, all material, characters, incidents, dialogue, and stage directions are wholly original and do not violate or infringe upon the copyrighted work of others and/or infringe upon, or violate, the rights of privacy or publicity of any persons. The Play contains or is based on certain material in the public domain. The Playwright further represents and warrants that he/she has the full right and authority to grant the rights herein conveyed to the Producer.

12. The laws of the State of New York will govern this agreement.

13. All notices required hereunder will be addressed to the parties at the addresses printed below their names, until other notice of change of address is given in writing, and will be by certified mail, return receipt requested or by electronic mail. Notices so given will be effective on the date of receipt thereof.

14. This document contains the entire Agreement between the parties. No changes, modifications, or alterations thereof will be effective unless contained in a writing signed by both parties.

15. This Agreement, and all written modifications, alterations, supplements, and amendments hereto contained in writing signed by the parties, will be binding on the parties, their executors, administrators, personal representatives, successors, and assigns.

16. Notwithstanding anything contained in the foregoing paragraph, it is agreed and understood that neither party may assign this Agreement without the written consent of the other party hereto, except that the Producer may assign this Agreement to a Joint Venture and/or Limited Partnership, of which he will continue to be a party, which will produce the Play. In addition hereto, the Playwright may assign this Agreement by will, trust, or other testamentary instrument, for the purposes of estate planning.

17. In the event of a claim or dispute between the parties, which cannot be settled by the parties themselves, either party may submit this dispute to arbitration in New York County, in the State of New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association and conducted by a member thereof. Judgment upon the award so rendered by the arbitrator may be entered by any court of competent jurisdiction. The arbitrator will require the party losing such dispute to pay the reasonable costs and attorney fees of the prevailing party.

18. Nothing contained herein is intended or should be construed as creating an employer-employee and/or work-for-hire relationship between the parties. At all times during the term of this agreement, the Playwright will be an independent contractor, over whom the Producer will not exercise any supervision or control. The parties expressly stipulate and agree that the Producer's payment of any fees hereunder, writing guidelines, or requests for changes and modifications in the Play will not constitute such supervision or control as to create an employer-employee or work-for-hire relationship.

AGREED TO AND ACCEPTED BY

PLAYWRIGHT                                          STRANGEMEN & CO.

                                                   By: _____

_____                      Jason Ralph, Artistic Director
James Oritz

                                                       63 W. 83rd St., Apt. 3F
                                                       New York, NY 10024

_____
(Address)

_____
Edward W. Hardy

61 East 97TH St. Apt #18
(Address) New York, NY 10029


Jen Loring


_____

(Address)