# Exhibit 3

# PRODUCTION AGREEMENT

This Agreement made as of the 14th day of September, 2015 by and between Strangemen LLC ("Producer") and James Ortiz ("Ortiz"), Edward W. Hardy ("Hardy" or "Composer"), and Jen Loring ("Loring" or "Lyricist") ("Ortiz", "Hardy" and "Loring" collectively referred to herein as the "Author").

**WHEREAS**, Author has written a dramatico-musical stage play entitled, "The Woodsman" (the "Play") which was commissioned by Producer pursuant to an agreement between the parties hereto dated January 1, 2015 (the "Commissioning Agreement", a copy of which is annexed hereto as Exhibit A and whose terms are incorporated herein by reference) and Producer wishes to exercise its rights to produce and present the Play pursuant to the terms set forth in the Commissioning Agreement.

**NOW THEREFORE**, Author wishes to grant such rights on the terms and conditions hereafter set forth:

1.      Grant of Rights.

a.      Author hereby grants to Producer the sole and exclusive option to produce and present regional and/or second-class productions of the Play with one or more companies throughout North America (at Producer's sole election) (the "Rights") for a period of ten (10) years, with no hiatus of production lasting for longer than four and a half (4 ½) months without a written commitment from the proposed next venue/theatre,  (unless otherwise extended pursuant to the terms of the Commissioning Agreement [the "Term"]), beginning upon the execution of this Agreement, in return for which Producer shall pay Author a total of Five Thousand ($5,000.00) Dollars as a recoupable, non-returnable advance against royalties, payable upon full execution of this Agreement. That advance will break down as follows:
1.   Two Thousand, Five Hundred Dollars ($2,500) to Ortiz
2.   Two Thousand, Eighty-Three Dollars and and Fifty Cents ($2,083.50) to Hardy
3.   Four Hundred Sixteen Dollars and Fifty Cents ($416.50) to Loring

b.      Author agrees to afford Producer the right of first refusal to secure the first class rights in the Play in the Initial Territory on terms to be negotiated between the parties in good faith.

c.      Although nothing herein shall be deemed to obligate Producer to produce the Play, Producer's right to produce the Play shall automatically terminate if Producer does not present the Play in a second-class production according to the terms of this Agreement by the end of the Term as may be extended pursuant to the terms of Paragraph 1(a) of this Agreement.

d.      The "Initial Territory" shall be North America.

e.      If there shall be an event of *force majeure* including, without limitation, any strike, walkout, or other work stoppage during the Term which materially hampers development and/or production of the Play, then the Term shall be extended automatically by a period equal to the duration of such event of *force majeure* plus thirty (30) days, but in no event more than six (6) months from the initial stop date.

f.      If Producer presents a commercial production under this Agreement with an official press opening and runs for no fewer than twenty-one (21) performances (counting no more than eight (8) preview performances), Producer shall have the exclusive right to acquire

the production rights in the Play in additional territories on terms to be negotiated in good faith between the parties hereto.

2.      Royalties. Author, collectively, shall be entitled to receive the following (subject to the division set forth in the Collaboration Clause annexed hereto as Exhibit A and incorporated herein by reference):

   a.       In respect of any regional or not-for-profit production hereunder ("Regional Production"), Author agrees to negotiate in good faith such fees and royalties (if any) as are customarily paid by such theatre or authors of musical works in accordance with such theatre's custom, practices and policies, but which agreement shall be offered to Author no less than sixty (60) days prior to the start of performances at each applicable theatre.  Author's representatives may conduct such negotiations on behalf of Author subject to this Paragraph (2)(a).   In connection with any Regional Production hereunder, Author hereby agrees to look solely to such theatre where such Regional Production is produced or presented for any and all compensation payable to Author with respect to such production of the Play, and shall hold Producer harmless from and against any liability or obligation to Author with respect to such production of the Play; and

   b.       in respect of any second class productions pursuant to this Agreement, the following shall apply:

      i.       Author will receive a royalty of   six (6%) percent of gross weekly box office receipts ("GWBOR"), rising to   seven (7%) percent in the week following one hundred and ten (110%) percent recoupment (which shall be determined on a company-by-company basis) provided that Producer shall have the right to institute a royalty pool on terms approved by Author in writing and in advance which shall be subject to such waivers, deferments, reductions and caps as Author may agree to, provided that if Author is paid on gross, Author shall receive such royalty weekly, provided that Producer shall have the right to institute a royalty pool on terms approved by Author in writing and in advance.
      ii.      The royalties to be paid hereunder to the Author shall be divided as agreed upon in the Collaboration Clause.

   c.       All royalties will be accompanied by copies of customary box office statements signed by Producer or its duly authorized representative.   If during the duration of the Producer's rights hereunder Producer causes an audit of its books and records, Producer shall cause a copy of such audit to be furnished to Author pursuant to the terms of Paragraph 14(d) below. Should any such audit reveal an underpayment to Author of more than 5%, Producer agrees to bear the cost of such audit.

3.      Subsidiary Rights Revenue of the Producer

   a.       Productions in the Initial Territory.  If Producer shall have presented, under its license or control, the requisite number of paid performances of the Play in the Initial Territory (counting no more than eight [8] preview performances) as states below, the Producer shall receive the following percentage of the net proceeds derived from any and all dispositions of any and all subsidiary rights (including first class rights) in the Play:

      i. upon fifteen (15) performances: 10%[1]
      ii: upon twenty-five (25) performances: 20%
      iii: upon forty (40) performances: 30%
      iv: upon fifty-six (56) performances: 40%

b.     As used herein, "Net Proceeds" shall mean one hundred (100%) percent of the gross receipts derived by Author, regardless of when paid or received, from any and all sources less only agents' commissions (not to exceed ten [10%] percent except with respect to amateur performances not to exceed twenty [20%] percent).

c.     Subsidiary rights shall be defined as (A) worldwide audio-visual rights, motion picture, television and/or allied rights, including, in respect of such motion picture and television rights, without limitation, soundtrack recordings, internet use and all other allied rights (such rights are sometimes referred to as "Motion Picture Rights"); (B) all stage performances (including first class, professional, revival, stock and amateur, regional theatre performances, concert versions, condensed or tabloid versions) in the all territories worldwide (except in respect of those productions produced under Producer's license or control)("Stage Performances"); and (C) radio, audio recordings, commercial and merchandising uses (except if exploited by Producer), sequels, prequels, spin-offs and foreign local television rights (such rights are sometimes referred to as "Ancillary Rights" or "Subsidiary Rights").  Television rights shall include all forms of television such as pay television, cable television, pay-per-view and free television.  Motion Picture Rights shall not include foreign local television productions which are productions of the Play in a foreign language and produced and distributed exclusively for television exhibition outside of the Initial Territory.

d.     Producer will share in Subsidiary Rights revenue from all dispositions of the Play made beginning with the date upon which Producer vests in such subsidiary rights pursuant to Paragraph 3(a) and extending through forty (40) years from the close of the last production under the Producer's license or control.

f.     Producer shall have exclusive rights to develop and exploit merchandising rights and to develop commercial use products during the period of production under this Agreement, which shall be subject to Author's prior written approval and conclusion of good faith negotiations for Author's participation in such merchandising.

g.     For the avoidance of doubt, Producer's share in Subsidiary Rights pursuant to this Paragraph 3 shall only be in effect for productions of the Play produced by third party parties in which Producer is not a producer or co-producer of the Play.

4.    <u>Additional Territories</u>

a.     Provided Producer has presented no less than  twenty-one (21) paid performances including an official press opening (and counting no more than eight (8) previews), Producer will have the exclusive right to produce, co-produce or license first or second-class productions of the Play as follows:

<u>TERRITORY "A":</u> All other English speaking territories, excluding Initial Territory.

---

[1] It is hereby noted and agreed that the necessary fifteen (15) performances required for the initial vesting has been completed by means of the Producer's prior production of the Play at 59E59 as referenced in the Commissioning Agreement.

a.   Advance payment in an amount to be negotiated by Producer and Author in good faith.

b.   Any advance from third party licensees in respect of an Additional Territory will be shared equally after deduction by the Producer of any advances paid to Author with respect to such Territory.

c.   The royalty provisions in Paragraph 2 hereinabove shall apply to productions under this Paragraph including the right to pay on NWOP or in a Pool.

5.   Cast Album

a.   Producer shall have the right to record and release or authorize the recording and release of a cast album or albums of the music and lyrics of any of the productions of the Play under Producer's license and control.  The choice of record company and the agreement for any and all such album(s) shall be subject to the prior written approval of Author, not to be unreasonably withheld.  The Net Proceeds received from the disposition of such cast album rights (which shall in no event be deemed to include any amounts contributed by a record company as a recoupable investment to the financing of the Play) shall be distributed forty (40%) percent to Producer and sixty (60%) percent collectively to Author with such revenue distributed to all parties constituting Author as Producer is informed in writing by a writing signed by all parties constituting Author.

b.   Holdbacks.

i.   Author shall have the sole right to control music publishing and small performing rights (including without limitation mechanical reproductions and synchronization rights) in the musical compositions contained in the Play, subject to the terms of this Agreement, and Producer shall not share in the proceeds derived therefrom.

ii.   Author agrees that the contract with the music publisher who publishes the music and lyrics of the Play does contain or will contain the provisions substantially to the following effect or having such effect:

"Music publisher agrees that it will make no disposition of the music and lyrics of the Play contrary to the restrictions set forth in this Agreement."

iii.   Neither Author nor their respective music publisher(s) nor anyone claiming through them shall sell, license or otherwise dispose of the right to use any of the music and lyrics of the separate musical compositions of the Play (except in connection with the sale, license or disposition of rights in the Play as a whole) in connection or for synchronization with any motion picture or television production or radio or television commercial or other advertisement in any media now known or hereafter devised until two (2) years after the close of all first-class commercial productions of the Play under Producer's license or control, unless the initial commercial production has run for less than three (3) months, in which case such period shall be reduced to one (1) year.  Notwithstanding the foregoing, Composer and Lyricist shall have the right to license the use of musical compositions of the Play on award programs, variety shows and talk shows, not to exceed three (3) such compositions per program.  Thereafter, Author and their respective music publisher may deal with the separate musical compositions for motion pictures or television without limitation.  Nothing herein contained shall be deemed to restrict rights customarily administered by the American Society of Composers, Authors and Publishers or any similar organizations to license small performing throughout the world and the music and lyrics of separate musical compositions of the Play.

6.    Changes to Play. There shall be no changes to the Play without the Author's prior written approval, and all such changes shall immediately belong to Author, under copyright and otherwise, free and clear of any liens and/ or encumbrances. All Author approvals hereunder shall be exercised with seventy-two (72) hours and delivered in writing (confirmed electronic mail is acceptable).  If a response to a request for approval is not communicated to Producer within seventy-two (72) hours of receipt (or twenty-four [24] hours if rehearsals of a production have commenced and is reasonably required by the circumstances), such individual matter shall be deemed approved.

7.    Rehearsal Rights. All parties constituting Author shall be entitled to attend developmental productions and rehearsals thereof prior to the initial commercial production of the Play under this Agreement, provided that Producer shall not be required to reschedule any production or rehearsal therefor to accommodate the schedule of any party constituting Author.

8.    Approvals.    Author shall have the right to approve the Director (if other than Ortiz or Devin Dunne Cannon) and principal designers.    Author shall be afforded meaningful consultation with regard to casting decisions.

9.    Representations, Warranties, and Indemnities

    a.    Each person constituting Author, with respect to his/her individual contributions to the Play, represents, warrants, and covenants as follows:

    (i)    That each such party constituting Author has the full and exclusive right to enter into this Agreement and to grant the rights herein granted.

    (ii)    That each such party as to his/her contributions hereunder are, and will continue to be wholly original with such party and no part thereof will be taken from or based upon or adapted from any other work of any kind not in the public domain.

    (iii)    That the Play is and will continue to be duly protected by copyright in the United States of America and other countries which are members of the Berne Union and/or Universal Copyright Convention; and that each such party has not, and to the best of such party's knowledge, no other person has done any act or omitted to take any action, the result of which would be the vesting of any portion of the Play in the public domain in any countries where copyright protection is available.

    (iv)    That there is not now outstanding and there has not been and will not be any grant, assignment, encumbrance, claim, contract, license, commitment, or other disposition of any right, title, interest, of any of the rights granted herein, or of any similar rights adverse to or inconsistent with the rights granted herein to Producer, or by which the fullest exploitation of the rights granted to Producer might be impaired, encumbered, diminished, invalidated or adversely affected in any way.

    (v)    That the Play will not, and the fullest exercise of the rights granted to Producer will not, conflict with or violate any rights of any third party, including, without limitation, rights of privacy, libel, and intellectual property rights, and that there have been and are no claims or litigation involving ownership or copyright in the Play or any portion thereof.

(vi)   Each such party agrees to defend, indemnify and hold harmless Producer and all others claiming by, through or under Producer, from and against any and all claims, liabilities, losses, damages, judgments, and expenses, including reasonable outside attorney's fees and disbursements, which may be made against or suffered by Producer and such others by reason of any claims made with respect to any breach or non-performance of any warranty, representation or agreement of such party herein.

b.   Producer will defend, indemnify and hold harmless Author and any others claiming by, through or under Author from and against all claims, liabilities, losses, costs, expenses and reasonable counsel fees and disbursements which may be made against or incurred by Author and such others arising solely out of its development, presentation, and production of the Play, but excluding any losses, costs, expenses, damages or recoveries caused by or arising out of any breach of the presentations or warranties made by Author under any provision of this Agreement.

10.   <u>Assignment</u>.  Producer shall be entitled to assign its right to produce the Play to an entity of which it is a general partner, member or manager, without the prior consent of Author but with advance notice to Author.   Upon such assignment and the express assumption of the obligations set forth herein by the assignee, Producer shall be relieved of any further liability with respect to the Play.  Author shall not be entitled to assign Author's obligations hereunder without prior written consent of Producer.

11.   <u>Billing</u>

a.   Author shall have equal billing immediately after the title of the Play, with no matter appearing between the title and their billing. Billing will appear as follows:

"By James Ortiz<br>
Music Composed by Edward W. Hardy<br>
Lyrics by Jen Loring"

b.   The size of the billing shall be no less than fifty (50%) percent of the type used for the largest letter of the title of the Play, thirty (30%) percent for artwork titles.  No billing will appear in the same size, type or prominence as Author. In no event shall any billing appear larger than Author with the sole exception of stars billed above the title.

c.   Producer shall have the right to use a so-called billing box or so-called motion picture billing, provided all other creative personnel, excluding the stars billed above the title, are included therein and the size of such billing shall be no less than fifty (50%) percent, provided that if an artwork title is used, the size and prominence of the billing shall be tied to the printed, not the artwork, title provided all others receiving billing other than stars billed above the title, are so billed.

d.   Author shall be accorded billing in all programs, souvenir programs, posters, houseboards and other advertising issued by or under the control of Producer subject to the following:

(i)   The foregoing requirements with respect to the size and order of the billing shall not be applicable with respect to use of quotes from critics' reviews (i.e., names of any person associated with the Play which are used in the context of quotations from cirtics' reviews may appear in such position and as the Producer in its discretion shall determine).

(ii)    The foregoing notwithstanding, Producer need not accord Author credit in "excluded ads" such as ads smaller than ¼ page, electric light marquees, outdoor advertising and any other advertising and publicity (excluding ABCs) where only the title of the Play, the name and address of the theatre, ticket prices, name of stars billed above the title and/or critics' quotes appear.

e.    Each person constituting Author shall receive a biography in all programs of the Play under Producer's license or control, the length of which shall be subject to reasonable space limitations as determined solely by Producer.

f.    No casual or inadvertent failure to comply with the provisions of this paragraph shall constitute a breach by Producer, provided Producer uses best efforts to promptly remedy the same prospectively after receipt of written notice of such failure from Author.

12.    House Seats; Opening Nights.  For each performance of each production (other than regional theatre or developmental productions) of the Play produced under Producer's license or control, each person comprising Author shall have not less than two (2) pairs of adjacent seats between the fifth (5th) and eighth (8th) rows of the center orchestra section or at another location within the theatre mutually agreed upon by Producer and Author.  With respect to each opening night performance hereunder, the foregoing house seats shall be complimentary, and each person comprising Author shall have the right to purchase an additional five (5) pairs of seats, best seats available; and all opening night tickets shall be accompanied by complimentary opening night party passes.  All such house seats with the sole exception for opening night shall be held until ninety-six (96) hours prior to each scheduled performance and shall be paid for at the regularly established box office prices.  Author further agrees, with respect to such house seats, to keep such records as are necessary to enable Producer to comply with the regulations of the New York State Attorney General and any other applicable regulatory body.

13.    Travel and Living.  At any time either party constituting Author is traveling at the request of Producer, such party(ies) shall be entitled to travel and living expenses as follows:

a.    For regional and/or LORT productions, such travel and living expenses to be no less favorable than with the customary terms offered by  the regional or LORT theatre in which Production of the Play is mounted.

b.    For commercial productions under this Agreement:  Producer shall provide round trip ground transfers to and from all airports, reimbursement of luggage charges, one (1) roundtrip economy class non-stop airfare per production, single occupancy hotel accommodations, a rental car where reasonably necessary, and a per diem of seventy-five ($75.00) dollars per day.  For the sake of clarity, Author will be afforded the travel expenses set forth in this subparagrph 13(b) for the purposes of attending the opening night performance of the first major regional production of the Play produced by Producer.

14.    Arbitration.  Any dispute or controversy arising from or relating to this Agreement shall be settled by arbitration before a single arbitrator with no less than three years theatrical law experience in New York, New York pursuant to the rules of the American Arbitration Association then in effect.  The parties agree that judgment may be entered upon any arbitration award in any court of competent jurisdiction.

15.    Miscellaneous

a.        This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, successors, administrators, licensees, successors and assigns.  This agreement constitutes the complete agreement between the parties hereto and supersedes all prior negotiations, agreements, and undertakings between the parties relating to the subject matter hereof.  This Agreement may not be changed or modified nor may any provision hereof be waived, except in writing signed by all parties hereto.

b.        THIS AGREEMENT, REGARDLESS OF THE PLACE OF ITS EXECUTION, SHALL BE INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE IN AND WHOLLY TO BE PERFORMED THEREIN.

c.        <u>Audit</u>.  Author or its duly designated representative shall have the right, not more frequently than once each twelve (12) months upon at least two (2) weeks prior written notice to Producer, to examine, copy and/or audit, Producer's books during normal business hours for the purpose of verifying and/or ascertaining any amounts which may be due hereunder.  Producer agrees to maintain complete and accurate books and records relating to each company of the Play for the two (2) year period following the close of such company.  Any inspection under this Paragraph shall be at Author's sole expense unless such audit reveals an underpayment to Author in excess of 5%.

e.        <u>Notice</u>.  All notices to be given under this Agreement to Author, including notices for approval shall be given to Author at the addresses hereinabove stated.  All notices to be given under this Agreement to Producer shall be sent to the addresses hereinabove with copies to Nathan Sheffield, Esq., Herzog & Sheffield P.C., 59 John Street, Suite 9B, New York, New York 10038.  All notices to be given under this Agreement to Author shall be sent to Leah Hamos, The Gersh Agency, 41 Madison Avenue, 33rd Floor, New York, NY 10010. All notices in the United States shall be sent by hand delivery, confirmed telefax, confirmed electronic mail, overnight or certified mail, return receipt requested, postage prepaid.  All notices outside the United States shall be sent by confirmed telefax, confirmed electronic mail or air courier.  All notices shall be deemed received on the date of delivery or attempted delivery, if refused.

f.        Nothing contained herein shall constitute a partnership or joint venture between all or any of the parties hereto.

g.        <u>Waiver</u>.  Except as otherwise  expressly provided herein, no purported waiver by any party of any breach by another party of any of their obligations, agreements or covenants hereunder, or any part thereof, shall be effective unless made by written instrument subscribed to by the party  or parties sought to be bound thereby, and no failure to pursue or elect any remedy with respect to any default under or breach of any provision of this Agreement, or any part thereof, shall be deemed to be a waiver of any other subsequent, similar or different default or breach, or any election of remedies available in connection therewith, nor shall the acceptance or receipt by any party of any money or other consideration due them under this Agreement, with or without knowledge of any breach  hereunder, constitute a waiver of any provision of this Agreement with respect to such or any other breach.  The rights and remedies expressly specified in this Agreement are cumulative and not exclusive of any other rights or remedies either party would otherwise have.

h.        <u>Severability</u>.  Each provision of this Agreement shall be considered to be severable and if, for any reason, any such provision or provisions, or any part thereof, is determined to be invalid and contrary to any existing or future applicable law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, but this Agreement shall be construed and enforced in all respects as if such invalid or unenforceable provision or provisions had been omitted.

i.      Further Instruments. Each of the parties hereto hereby agrees that they shall hereafter execute and deliver such further instruments and do such further acts as may be required or useful to carry out the intent and purpose of this Agreement and that are not inconsistent with the terms hereof.

j.      Headings. Headings contained herein are given for convenience only and shall not be construed or deemed to have any weight with respect to interpretation of this Agreement.

k.      Execution. This Agreement shall be executed in five (5) original copies so that one fully executed copy may, and shall, be delivered to each Party. The fifth executed copy shall be kept on file at Herzog & Sheffield, P.C., 59 John Street, Suite 9B, New York, NY 10038. Further, this Agreement may be executed in duplicate counterparts, by facsimile or otherwise, each of which, when taken together, shall constitute one and the same original.

l.      Reservation of Rights. All rights in and to the Play not expressly granted to Producer hereunder shall be retained by Author.

IN WITNESS WHEREOF, the parties hereto set their hands as of the day and year first above written.

ACCEPTED AND AGREED TO:
PRODUCER:

_____
Strangemen LLC

By: ___Jason Ralph___

AUTHOR:

_____  9-14-15
James Ortiz

_____  9-16-15
Edward W. Hardy

_____  9/17/15
Jen Loring

## <u>EXHIBIT A</u>

## COLLABORATION CLAUSE

1. The copyright of the Play shall be secured and held by Co-Writers Ortiz, Hardy and Loring jointly.

2. Unless otherwise stated in this Agreement, all assets, claims, income, rights, profits, fees, receipts, and returns of whatever kind (all herein referred to as "Benefits") derived by the parties hereto from the Play and/or from the disposition of any allied, ancillary or subsidiary rights therein shall be divided by the parties as follows:

   | | |
   |---|---|
   | To Ortiz | 50.00% |
   | To Hardy | 41.67% |
   | To Loring | 8.33% |

3. All contracts for production, presentation and publication of the Play, or the disposition of all rights connected therewith, and all author approvals, shall be subject to the mutual approval of the parties.

4. All decisions, both artistic and of a business nature, in connection with the Play, shall be determined by majority vote of the Author team, with each person comprising the Author having one vote.  Notwithstanding the foregoing, alterations in, omissions from and additions to the Play shall be subject to the exclusive prior written approval of Ortiz, Hardy and Loring respectively.

5. In the event of the death of either party during the term of this Agreement, the surviving party shall have the right to act generally with regard to all artistic matters relating to the Play (including, but not by limitation, any changes or alterations which may be required in the text and approval of the cast and director), except that the credit provision contained herein shall survive the death of a party hereto.  The personal representative(s) of a deceased party shall receive his decedent's share of the Benefits.